**Randy Wayne CHAPMAN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–91–0103–CR.**

Court of Appeals of Texas, Amarillo.

June 10, 1992.

Discretionary Review Refused Sept. 30, 1992.

V.G. Kolius, Greta Rapstine Crofford, Amarillo, for appellant.

Randall L. Sherrod, Crim. Dist. Atty., Kay Davis, Canyon, for appellee.

Before REYNOLDS, C.J., and BOYD and POFF, JJ.

POFF, Justice.

Appellant Randy Wayne Chapman was found guilty of capital murder by a jury. Because appellant was younger than seventeen at the time the offense was commit-

ted, he was automatically sentenced to confinement in the Institutional Division of the Texas Department of Criminal Justice for life. *See* Tex.Penal Code Ann. § 12.31(a) (Vernon Supp.1992); Tex.Penal Code Ann. § 8.07(d) (Vernon Supp.1992).

In the first of two points of error, appellant contends that the State failed to prove all elements of the indictment because the State failed to prove beyond a reasonable doubt that he caused the death of two individuals during the course of the same criminal transaction. In his second point of error, appellant contends that the trial court erred in overruling his challenges for cause to two prospective jurors and in denying his request for an additional peremptory challenge. We will overrule both points of error and affirm the judgment of the trial court.

In a written statement given to police, appellant admitted killing two teenage boys on the evening of November 18, 1989. A Randall County grand jury subsequently indicted appellant for the offense of capital murder under Tex.Penal Code Ann. § 19.-03(a)(6)(A) (Vernon 1989), which reads:

> A person commits [capital murder] if he commits murder as defined under Section 19.02(a)(1) of this code [1] and the person murders more than one person during the same criminal transaction.

The jury was charged in accordance with the indictment and returned a verdict of guilty. The term "criminal transaction" was not defined for the jury. In his first point of error, appellant contends that the State failed to prove beyond a reasonable doubt that he caused the death of the two boys during the same criminal transaction. Therefore, appellant contends that the State did not prove every element of the offense as is required by law. *Vuong v. State,* 830 S.W.2d 929, 939 (Tex.Crim.App. 1992).

Our first task in addressing appellant's first point of error is to determine the meaning of "criminal transaction." The appellate courts of this state have yet to explicitly define the term in the context of section 19.03(a)(6)(A). However, the Legislature and the Court of Criminal Appeals

have provided us with guidance as to the outer parameters of the definition.

The Legislature has limited how broadly the term "criminal transaction" can be defined. Pursuant to the subsection of the Texas Penal Code immediately following section 19.03(a)(6)(A), capital murder is deemed committed where a person murders more than one person "during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct." Tex.Penal Code Ann. § 19.03(a)(6)(B) (Vernon 1989). Thus, we learn that a criminal transaction is not synonymous with "the same scheme or course of conduct."

The Court of Criminal Appeals has explicated a narrow definition of the term "same criminal transaction." In *Vuong v. State,* 830 S.W.2d 929 (Tex.Crim.App.1992), the defendant entered a Vietnamese pool room and cafe armed with a semi-automatic rifle. He proceeded to walk methodically through the establishment, take deliberate aim at individuals, and then shoot them. He fired eleven shots, seven of which struck persons. Two individuals were killed. The Court stated that the defendant "killed the two victims in a continuous and uninterrupted chain of conduct occurring over a very short period of time," and that "both killings occurred in a rapid sequence of unbroken events." *Id.* at 941. The court concluded that "[e]ven the most narrow construction of the term 'same criminal transaction' would include [these] type[s] of actions." *Id.*

■ Viewing the evidence in the current case in the light most favorable to the verdict as we are required to do, *Human v. State,* 749 S.W.2d 832, 834 (Tex.Crim.App. 1988), appellant's conduct falls somewhere in between the narrowest possible interpretation and the broadest possible interpretation of criminal transaction. The record shows that the fifteen-year-old appellant was angry with two acquaintances for allegedly stealing some items from his house and that he planned to invite them to his house and "blow them away." Appellant invited 17–year–old Billy Joe George II to

---

**1.** Section 19.02(a)(1) states that "[a] person commits murder if he intentionally or knowingly

causes the death of an individual." Tex.Penal Code Ann. § 19.02(a)(1) (Vernon 1989).

his house under the guise of selling him a gun. George was accompanied by 19–year–old Richard David Glasscock. The two young men arrived at appellant's house in a pickup. George went to the door while Glasscock stayed in the pickup. Appellant invited George into the house where he proceeded to shoot him in the stomach with a .12 gauge single-shot shotgun. George fell to the floor. Appellant reloaded his shotgun and shot George in the head while he was still on the ground. The second shot caused massive destruction to George's brain. This shooting took place at about 7:00 p.m.

After shooting George, appellant telephoned his cousin to tell him he had shot someone. Then appellant hung up the telephone, exited his house through the back door and went across the street to the home of his neighbor, Helen Marchman. Appellant, still carrying his shotgun, told Marchman that he had just shot the man who had been stealing guns from his house. Appellant enlisted Marchman's help in locating his father who was visiting a friend. Being unable to remember the telephone number of his father's friend or the correct spelling of his father's friend's name, appellant failed to contact his father. Appellant stayed at the Marchman's house for ten or fifteen minutes. He then reloaded his shotgun and exited the Marchman's house to return to his house which was approximately 100 to 150 feet away.

On the way to his house, appellant crept up on Glasscock who was still seated on the passenger side of the front seat of the pickup. Glasscock was looking toward the driver's side door. Appellant opened the passenger door and shot Glasscock in the face just as Glasscock turned to look at him. The shot was fired at close range and killed Glasscock instantly. Appellant proceeded to enter his house. Shortly thereafter at about 7:40 p.m., appellant's cousin, Kevin Boydstun, arrived. Boydstun encouraged appellant to call the police. Appellant called 911 and told the dispatcher he had shot and killed two persons. Police arrived at the scene at 7:45 p.m.

Unlike the defendant in *Vuong*, appellant did not commit the two murders in a rapid sequence of unbroken events. Rather, at least ten or fifteen minutes elapsed between the shootings. Thus, the *Vuong* case does not mandate the finding that appellant's actions comprised but one criminal transaction.

On the other hand, appellant's actions were clearly part of the same scheme or course of conduct. Appellant was angry with George and Glasscock and desired to kill them both. He purposefully loaded his gun, crept up on Glasscock and shot him only ten to fifteen minutes after shooting George.

■ We find appellant's conduct falls somewhere in between the narrowest possible interpretation and the broadest possible interpretation of "criminal transaction." We hold that the term "criminal transaction" should be interpreted expansively. A broad interpretation of the term would be in keeping with the intent of the Legislature and the Court of Criminal Appeals' interpretation of other portions of our capital murder statute.

Our Legislature has stated that the provisions of the Texas Penal Code are intended, and are to be construed, to insure the public safety through the deterrent influence of the Code's penalties. Tex.Penal Code Ann. § 1.02(1)(A) (Vernon 1974). One of the purposes of the Penal Code is "to prescribe penalties that are appropriate to the seriousness of offenses." Tex.Penal Code Ann. § 1.02(3) (Vernon 1974). By its enactment of section 19.03(a)(6), the Legislature sought to subject those who commit multiple murders to the most severe punishment possible. A broad definition of criminal transaction is consistent with that intent.

The Court of Criminal Appeals has broadly construed other portions of Texas' capital murder statute. For example, Tex.Penal Code Ann. § 19.03(a)(2) (Vernon 1989) provides that a person commits capital murder if he "intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, or arson." The phrase "in the course of committing" might be thought to limit the State's capital murder prosecutions to situations where offenders committed the murder during the actual commission or at-

tempted commission of the underlying felony. However, the Court of Criminal Appeals has interpreted that phrase more broadly, holding that section 19.03(a)(2) is satisfied by the commission of a murder both shortly before and shortly after the commission of the associated felony. *See Gentry v. State,* 770 S.W.2d 780, 797 (Tex. Crim.App.1988); *Wooldridge v. State,* 653 S.W.2d 811, 816 (Tex.Crim.App.1983).

Similarly, the Court of Criminal Appeals has construed another portion of the capital murder statute in a broad fashion. Tex.Penal Code Ann. § 19.03(a)(3) (Vernon 1989) states that a person commits capital murder if he "commits the murder for remuneration or the promise of remuneration." In *Beets v. State,* 767 S.W.2d 711, 727 (Tex.Crim.App.1987), the Court originally concluded that "the statute was meant to cover only the situation where the accused has been hired or has hired another individual to perform the act of murder of another individual, and was not meant to include all forms of pecuniary gain." On motion for rehearing, however, the Court abandoned its narrow definition of remuneration and held that murder for remuneration occurs "where the actor kills a victim in order to receive a benefit or financial settlement paid upon the death of the victim, such as proceeds of insurance and retirement benefits." *Id.* at 737.

■ In light of the evident intent of the Legislature and the Court of Criminal Appeals to construe our capital murder statute broadly, we hold that as used in section 19.03(a)(6)(A),

> the term "criminal transaction" describes multiple acts that are closely connected in time, place and circumstance and that arise out of a single guilty design.

We find that appellant's actions in killing both George and Glasscock constitute the very type of conduct the Legislature sought to make a capital offense by its enactment of section 19.03(a)(6)(A). Under our definition of criminal transaction, appellant's two acts of murder were unquestionably committed during the same criminal transaction. The acts were committed within fifteen minutes and 150 feet of one another. Additionally, it was appellant's single design to kill both young men. Appellant's first point of error is overruled.

■ In his second point of error, appellant contends that the trial court erred in overruling his challenges for cause to two prospective jurors, Allen Pippin and Ruth White. "In reviewing the ruling of a trial court on a challenge for cause based on the bias of the venireman, the decision of the trial court will not be disturbed absent an abuse of discretion." *Williams v. State,* 773 S.W.2d 525, 526 (Tex.Crim. App.1988). In testing the court's action, we will consider the venireperson's testimony as a whole. *Pyles v. State,* 755 S.W.2d 98, 103 (Tex.Crim.App.1988). Appellant argues that venirepersons Pippin and White were biased against the law applicable to the case because they could not consider the minimum punishment of five years probation in a murder case.[2] A venireperson who is unable to consider the full range of punishment is subject to challenge for cause. *Barrow v. State,* 688 S.W.2d 860, 863 (Tex.Crim.App.1985); *Mowbray v. State,* 788 S.W.2d 658, 666 (Tex.App.—Corpus Christi 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 999, 112 L.Ed.2d 1082 (1991). Our review of the record shows that both prospective jurors were able to consider the full range of punishment.

■ Appellant contends that Pippin could not consider the minimum punishment because he could not think of a fact situation other than a mercy killing where he would consider five years probation to be an adequate punishment for murder. However, a prospective juror's inability to articulate a set of facts where the minimum sentence is appropriate does not mean he cannot consider the full range of punishment. *Hogue v. State,* 711 S.W.2d 9, 27 (Tex.Crim.App.1986). Pippin stated several times that he could consider the full range of punishment for the lesser included offense of murder. Thus, he was not disqualified as a juror as a matter of law. *Faulder v. State,* 745 S.W.2d 327, 339–40 (Tex.Crim.App.1987).[3] That being the case,

---

**2.** The jury in this capital murder case would have determined appellant's punishment had it found him guilty of the lesser included offense of murder.

**3.** The facts in this case are distinguishable from those found in *Sunday v. State,* 745 S.W.2d 436 (Tex.App.—Beaumont 1988, pet. ref'd). In *Sunday,* the Court of Appeals held that the trial

the court's refusal to sustain the defendant's challenge for cause is to be reviewed in light of all of the answers the prospective juror gives. *Id.* Upon reviewing all of Pippin's answers, we conclude that the trial court did not abuse its discretion in overruling the challenge to Pippin for cause.

 Appellant claims that White was unable to consider the minimum punishment. Appellant's claim is based on the following colloquy between defense counsel and White:

Q. You've told the District Attorney that you could consider the full range of punishment which would on the high end of the scale be life imprisonment or 99 years and on the low end of the scale, five years probation.

A. Yes, sir.

Q. Are you pretty comfortable that you could do that?

A. Without knowing the facts?

Q. I don't want to bind you to these facts, but in any case—

A. Right, I understand.

Q. —just any case.

A. Yes, sir, I could.

Q. Let me ask you, Ms. White, and let me give you an example that may or may not help you, and kind of let me close the door just one way or another. Suppose that you, as a juror, had participated in a trial and they found as a jury a person guilty of murder. This is just a hypothetical case. And the Judge had told you that murder means the knowing and intentional taking of another person's life without any justification or without any excuse. In other words, if somebody just killed somebody, and you and your fellow jurors had found that person guilty and you've heard all the evidence, good evidence, bad evidence, whatever you want to make up in your own mind, see. You go into the jury room to deliberate, can you think of a set of facts in a murder case where you could consider five years probation as adequate punishment?

A. See, I guess you're asking me if I was a juror and I found somebody guilty of murder, could I come out with a sentence of just five years?

Q. Could you just consider the full range of punishment, consider five years as adequate punishment in any case you want to visualize.

A. No, sir, I don't think I could.

Q. Why is that, please?

A. I guess because I raised my kids to believe that there are consequences to everything that you do in your life, whether they're good or bad. I just can't see somebody just going out and killing someone and considering that life only being worth five years.

Q. You can't consider in your mind any set of facts where you can consider five years probation as enough penalty for murder?

A. I guess the question I'm seeing that you're asking me is if somebody went out and just bluntly killed someone for no reason, could I see that five years probation sentence could be—no, I don't believe I could.

We find that even if, *arguendo*, the foregoing testimony evidenced a bias against the law on the part of White, the following exchange between the district attorney and White served to rehabilitate her:

Q. As I was sitting there listening to that, I think [defense counsel] unintentionally misled you from this standpoint: To go kill someone coldly with no reason at all is binding you to a set of facts.

A. That's what I'm understanding.

Q. That's right. And the question I'm talking about, there's all kinds of murder cases that you have. I can talk about the kind that [defense counsel] is speaking of where a person kills someone with no apparent motive.

court improperly overruled the defendant's challenge for cause against a venireperson who consistently stated that she could consider the minimum sentence of five years probation in a murder case *only* where the murder was a mercy killing. The venireperson never backed away from that position. She never stated that she could consider the full range of punishment as did Pippin.

A. That's what I'm understanding.

\* \* \* \* \* \*

Q. The question I've got, there's really all kinds of murder cases that can occur. Some where there's apparent motive. It may not be justifiable, but it may be a reason that the killing occurred, maybe a reason that a jury could consider to mitigate the offense of murder itself. I guess really, what I'm asking is, you as a juror have listened to all the facts in a given case and I don't want you to be bound to just the facts that [defense counsel] has, a random killing for no apparent reason. What I want you to do is consider all the possibilities you can set in your mind involving murder cases. And after sitting there and listening to all the evidence, listen to the evidence about the killing, listen to the evidence about the evidence of motive if one is given in court, listening about the particular defendant that's involved, do you think in a proper case, after listening to all the evidence, that you could consider five years probation?

A. Understanding that way that you're putting that, then yes, sir, I could.

Q. Okay. And again, I'm trying to get in your mind without telling you this is a killing where a person kills for no reason at all. I want you to consider and just think of any fact situation you can in your mind, age of defendants, types of defendants, reasons that murder may occur. And all I want to know right now, if you're going to be open-minded enough that if the situation arises on the particular case that you've heard, that you personally felt like the minimum of five years probation was proper, could you consider that as a proper form of punishment?

A. Yes, sir, I could. I understand now.

We conclude that White was able to consider the entire range of punishment. The trial court did not err in denying appellant's challenge of White for cause.

 By means of his second point of error, appellant also contends that the trial court erred in denying his request for an additional peremptory strike. However, a trial court does not err in overruling a defendant's request for additional peremptory strikes unless the court improperly overrules the defendant's challenge for cause and forces him to use a peremptory strike on the prospective juror. *Thomas v. State*, 701 S.W.2d 653, 658 (Tex.Crim.App. 1985). Here, the trial court properly overruled appellant's challenge for cause. Therefore, the trial court could not have erred in overruling appellant's request for an additional peremptory strike. Appellant's second point of error is overruled.

The judgment of the trial court is affirmed.